# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00137-COA

JOHN TENNESEN AND SANDRA TENNESEN        APPELLANTS

v.

CITY OF HATTIESBURG, MISSISSIPPI        APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 01/04/2021 |
| TRIAL JUDGE: | HON. JON MARK WEATHERS |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | MICHAEL V. RATLIFF |
| | DANIEL MYERS WAIDE |
| ATTORNEYS FOR APPELLEE: | L. CLARK HICKS JR. |
| | R. LANE DOSSETT |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 11/08/2022 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**CARLTON, P.J., FOR THE COURT:**

¶1. A van operated by James Willis was fleeing a pursuit initiated by a Hattiesburg police officer. While fleeing the officer, Willis ran a red light at the intersection of Hardy Street (Highway 98) and Westover Drive in West Hattiesburg, crashing into the passenger side of a pickup truck driven by John Tennesen. John's wife, Sandra, was seated in the passenger seat. John and Sandra sued the City of Hattiesburg under the Mississippi Tort Claims Act (MTCA), Miss. Code Ann. §§ 11-46-1 to -23 (Rev. 2019), seeking to recover damages for the personal injuries and property damage they incurred. Following a bench trial, the Forrest County Circuit Court entered judgment in the City's favor, finding that the Tennesens failed

to establish that the Hattiesburg police officer acted with "reckless disregard" for their safety and well-being and that the City therefore was entitled to police-protection immunity pursuant to section 11-46-9(l)(c) of the MTCA. The Tennesens appeal, asserting that the trial court erred in determining that the City was entitled to police-protection immunity under the facts of this case.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶2. On September 17, 2017, about a quarter-past one on a Sunday afternoon, John Tennesen was traveling westbound in a Nissan Titan pickup truck on Hardy Street[1] in West Hattiesburg. John's wife, Sandra, was in the passenger seat. John turned left on a green arrow onto Westover Drive and started to proceed through the intersection. At the same time, a van operated by Willis was fleeing a pursuit initiated by a Hattiesburg police officer named Jacob Knight. Willis was speeding eastbound on Hardy Street, entered the intersection at Hardy Street and Westover Drive against a red traffic signal, and crashed into the Tennesen vehicle on the passenger side. John and Sandra were injured in the crash and the truck was damaged extensively.

¶3. After providing the City of Hattiesburg with pre-suit notice, the Tennesens sued the City for damages under the MTCA, alleging that Officer Knight, in the course and scope of his employment as an officer with the Hattiesburg Police Department (HPD), acted in reckless disregard of their safety and well-being, causing the collision and their injuries. The

---

[1] "Hardy Street" and "Highway 98" are used interchangeably throughout this opinion.

2

City filed its answer to the Tennesens' complaint. After the parties conducted discovery, a bench trial was held before the Forrest County Circuit Court on March 10 and 11, 2020.

¶4. Prior to trial, the parties stipulated to the admission of all exhibits that are a part of the appellate record. Trial began. The Tennesens called Officer Knight as an adverse witness.

¶5. Officer Knight testified that he had been with the HPD for eleven months on the day of the collision involving the Tennesens (September 17, 2017). He had been trained and certified as a police officer at the Mississippi Delta Community College Law Enforcement Training Academy, and he had trained with the HPD on police pursuits, including driving courses and classroom education at the time he was hired. Officer Knight had been involved in three previous pursuits before the accident involving the Tennesens. One of those pursuits ended in a vehicular collision between a driver and the operator of the vehicle being pursued. Officer Knight acknowledged that, based upon his pursuit experience, he was aware that pursuit-related accidents were foreseeable.

¶6. Regarding the circumstances surrounding the pursuit and ultimate collision on Sunday, September 17, 2017, Officer Knight testified that he received a call from dispatch at about 1:00 p.m., informing him that a white van with Louisiana license tags had fled the Walmart on Highway 98 in West Hattiesburg. He responded to the call. In addition to Officer Knight's testimony, the course of events following the dispatch is also documented on videos admitted into evidence from both within the patrol car and on the officer's body camera, as well as the HPD call report. Officer Knight testified that after receiving the call

3

from dispatch, as shown on the video, he proceeded to Highway 98, at which time he saw the suspect's vehicle, a white Econoline van. The video depicts Officer Knight communicating with dispatch, calling in the Louisiana tag number, and Officer Knight identifying a broken windshield that would constitute his probable cause for stopping the van. Officer Knight then drove his patrol car in the direction of the van, and he placed his unit directly behind the suspect's van. He then activated his patrol car's emergency blue lights and began using his siren in an attempt to get the suspect to pull over. He testified he used all four tones on his siren to "mak[e] sure [the suspect] was able to hear one of the tones."

¶7. Officer Knight testified that when he called in the Louisiana tag number, he did not have any other potential identifying information on the suspect. He acknowledged that he frequently worked calls for service at the Walmart on Highway 98 and was generally familiar with its procedures and surveillance capabilities. With respect to the stolen property, Officer Knight testified that he knew there had been a report of a stolen fifty-five-inch television, but he had no other information about the potential crime, such as the value of the property, whether the value reached the threshold for a felony,[2] or that the item had been discarded when the suspect fled Walmart. Officer Knight acknowledged that he knew that there was church traffic at 1:00 along Hardy Street from two large churches in the area, and he further acknowledged that there were about twenty to thirty restaurants in the area.

---

[2] At the time, shoplifting an item valued at more than $1,000 was a felony. Miss. Code Ann. § 97-23-93(7) (Rev. 2014).

4

¶8.     After he called in the tag number, Officer Knight informed dispatch that "we're coming up on Mayfair," and the suspect was not stopping—even though he (Officer Knight) was using emergency lights and his siren to attempt a stop.  Officer Knight also added, as shown on the video, "We're not speeding, though."  Officer Knight testified that at this point, he could not tell if the suspect was attempting to evade him, or looking for a place to pull over.  However, a few seconds later when the suspect approached the intersection of Hardy Street and Mayfair Road, the suspect sped up.  At this point, Officer Knight called dispatch announcing the code for a police pursuit (1094).  On the dispatch exchange, he is asked, "What's traffic like?"  He answered, "Not too heavy."  The video from the patrol-car camera likewise shows little traffic, and there were no cars in the right turning lane during this time.

¶9.     Officer Knight testified that the suspect ran two red lights: one at the Fairfield Drive intersection when Officer Knight attempted to initiate a stop and the other at Mayfair Road when the suspect accelerated.  Officer Knight testified that he slowed down at each intersection to make sure it was safe to cross through the intersections. The suspect started to create distance between himself and Officer Knight at the Mayfair Road intersection, and the suspect had moved to the right turning lane where there was no traffic.  Officer Knight said he believed the suspect was going over sixty miles per hour and that his own speed "touched 60" miles per hour in the forty-five-miles-per-hour zone.  He testified that the suspect went through a yellow light at Coca-Cola Street when approaching the intersection of Westover Drive where the accident occurred.  The van approached Westover and Hardy

5

Street while proceeding in the turning lane, ran the red light, and was involved in a collision with the Tennesens' vehicle.

¶10. During questioning by the Tennesens' counsel, Officer Knight acknowledged that he knew that the Westover intersection was one of the most dangerous intersections in the city; that speeding, running red lights, or driving in a turning lane can lead to a crash and these activities are dangerous. However, Officer Knight also testified that on September 17, 2017, the weather was clear, and visibility was good. Hardy Street is a main thoroughfare, but traffic was light to moderate on this Sunday afternoon. Officer Knight acknowledged that there were multiple intersections with traffic lights, as well as restaurants and businesses located away from the street. The video from the patrol-car camera shows that many of the restaurants and businesses were set back along Hardy Street in various strip malls, traffic was not heavy, and no pedestrians were present. The record reflects that Officer Knight stayed in constant communication with dispatch and his supervising officer, Lt. Mark Denny, who had called in after the pursuit was initiated to ask about the traffic status.

¶11. Regarding the length and duration of the pursuit, as noted, Officer Knight testified that he initiated the pursuit at Mayfair Road. Upon questioning and reviewing the HPD dispatch log, Officer Knight confirmed that twenty-seven seconds elapsed from the time the pursuit was noted or called in to dispatch until the time of the crash and the distance from that point to the accident site was approximately one-half of a mile. He testified that the pursuit was short in time and distance. On further questioning by the Tennesens' counsel, Officer Knight

6

acknowledged that the suspect ran the first red light at Fairfield Drive and that the lapse of time between Fairfield Drive and the crash was approximately fifty seconds. Officer Knight also testified, however, that at Fairfield Drive, the suspect had not begun to speed up. Regarding other circumstances relating to the pursuit, Officer Knight testified that the streets were well-marked with smooth surfaces and no curves or blind hills. There were no pedestrians, sharp curves, or obstructions. As Officer Knight testified, because the chase had just started at the time of the accident, he was processing all the pursuit factors, including consideration of traffic and the weather, among other factors.

¶12. Explaining his decision to exercise discretion and pursue the suspect, Office Knight testified:

> I was trying to make sure that the fleeing suspect was captured obviously, but I was also going over all the risks and factors in my head. You can hear other officers calling me and making sure that I am thinking of these things. I mean, it wasn't a very long chase. It happened pretty quick.

Officer Knight also testified that he felt that he would not be doing his job if he had terminated the pursuit after the suspect ran the red light at Mayfair Road. Further, he confirmed that at no time did he believe that the risk to the public was greater than attempting to pull over the suspect.

¶13. During his testimony, Officer Knight acknowledged specific portions of HPD's pursuit policy that were admitted into evidence, and he answered questions about his interpretation of the policy and his compliance with those provisions during the pursuit. He testified that HPD's pursuit policy did not specifically prohibit the pursuit of someone who

7

was suspected of a misdemeanor, and in this case, he did not know if the alleged shoplifter had committed a felony or misdemeanor. Based on the circumstances, Officer Knight testified that he did not believe that the risk to the public was greater than attempting to apprehend the suspect and that the pursuit did not violate any HPD pursuit policy. The HPD policies and procedures will be discussed in further detail below.

¶14. Regarding the Tennesens' remaining witnesses, Sandra testified that on the day of the crash, she was sitting on the passenger side of the truck, John was driving, and they were waiting to turn left from Hardy Street onto Westover Drive. When the light turned green, John proceed to turn left through the intersection. She did not see the van coming but felt its impact when it hit the truck on the passenger side. She testified that before the accident happened, she did not see Officer Knight's patrol car, its blue lights, or hear its siren. Sandra's remaining testimony concerned damages, which are not at issue here. The Tennesens' daughter, Misty Kirby, also testified. She was not a passenger in the vehicle or a witness to the accident, so her testimony related solely to the Tennesens' damages.

¶15. John Tennesen testified that on the day of the accident he was driving his wife's new Nissan Titan truck westbound on Hardy Street and that Sandra was in the passenger seat. He entered the inside lane of the left turning lane on Hardy Street and stopped for a red traffic signal. When the light turned green, he drove the truck into the intersection, and it was struck by a vehicle on the passenger side. John provided no testimony about the actions of the driver of the other vehicle or Officer Knight prior to the accident. His remaining

8

testimony concerned damages.

¶16.     After presenting their witnesses and other evidence, the Tennesens rested. The City moved for an involuntary dismissal pursuant to Mississippi Rule of Civil Procedure 41(b), arguing that the Tennesens had shown no right to relief to overcome the City's police-protection immunity under section 11-46-9(1)(c). In particular, the City asserted that the Tennesens failed to show that Officer Knight, acting in the course and scope of his employment with the HPD, "acted in reckless disregard of [their] safety and well-being." Miss. Code Ann. § 11-46-9(1)(c). The trial court denied the City's Rule 41(b) motion.

¶17.     The trial proceeded. The City called four witnesses in support of its liability defense. Three of these witnesses provided testimony regarding the ten-factor *Brister*[3]/*Richardson*[4] test used in police-pursuit cases to make a "reckless disregard" assessment,[5] and also testified about Officer Knight's compliance with the HPD pursuit policy. Their testimonies are briefly summarized here and are discussed in further detail below.

¶18.     Lt. Harris Tapp testified in the City's behalf as the Commander of Internal Affairs at the time of the accident involving the Tennesens. His responsibilities included investigations on all pursuits within the department, including the subject pursuit. He found no HPD

---

[3] *City of Jackson v. Brister*, 838 So. 2d 274, 280 (¶22) (Miss. 2003).

[4] *City of Ellisville v. Richardson*, 913 So. 2d 973, 977 (¶15) (Miss. 2005).

[5] The ten factors under *Brister/Richardson* are separately addressed in our discussion below, as well as the similar, but not identical, eight factors that an officer must assess in deciding whether to undertake a pursuit, which are set forth in the City's pursuit policy.

9

pursuit policy violations on Officer Knight's part.

¶19.    Lt. Mark Denny testified in the City's behalf as Officer Knight's supervising officer who was on duty at the time of the accident.  He testified that part of his duty as Officer Knight's supervisor included monitoring the progress of the pursuit.  Lt. Denny addressed the HPD pursuit policy in detail and confirmed that Officer Knight complied in all respects with the policy.  He further confirmed that he had the authority to terminate the pursuit, but he did not do so before the collision because he did not find "any kind of circumstances [requiring him] to do so at that point" under the HPD pursuit policy.

¶20.    Retained expert Mark Dunston, Chief of Ocean Springs Police Department, was accepted by the trial court as an expert in the field of law enforcement and, specifically, matters of law enforcement pursuits.  Chief Dunston confirmed that he had reviewed the HPD policies, procedures, and the HPD Administrative Operations Manual that contained the pursuit policy.  He also reviewed exhibits that were admitted into evidence, including the HPD Uniform Accident Report, the incident report, the vehicle pursuit form, Officer Knight's statement, and the report detailing the call listings from dispatch.  Chief Dunston also testified about his personal knowledge of the Highway 98 and Westover Drive area that he gained when he lived and worked in Hattiesburg while employed as an instructor at University of Southern Mississippi's Police Corps.  He also reviewed the area in preparation for this case.

¶21.    Chief Dunston discussed the HPD's pursuit policy and its application to the factual

situation in this case. He opined that Officer Knight's actions complied with HPD's pursuit policy and procedures and that the factors in HPD's pursuit policy favored the pursuit. Chief Dunston also addressed the *Brister/Richardson* factors. In his expert opinion, after considering the factual situation, the *Brister/Richardson* factors, and HPD's pursuit policy, Dunston found that Officer Knight acted reasonably and properly and that he did not act with "reckless disregard."

¶22. The City also presented the testimony of independent witness John Fleming who testified that he did not observe Officer Knight's patrol car following behind the suspect that struck the Tennesen vehicle until well after the accident occurred.

¶23. The trial was adjourned after the defense concluded its case. On January 4, 2021, the trial court issued its memorandum opinion detailing the witnesses' testimonies, the applicable law, and the court's findings of fact and conclusions of law. The trial court found "that based upon the totality of the circumstances . . . [O]fficer Jacob Knight['s] [actions] did not rise above simple negligence, that he did not act in reckless disregard of the safety and well-being of the Tennesens who were not engaged in criminal activity, and that the City is entitled to police-protection immunity." Accordingly, the trial court found that "[t]he City of Hattiesburg is entitled to judgment pursuant to Mississippi Code Annotated [section] 11-46-9 (l)(c)." On the same date, the trial court entered its judgment finding in the City's favor and dismissing the Tennesens' complaint with prejudice. Additional details regarding the trial court's opinion and findings are discussed below.

¶24. The Tennesens appeal.

## STANDARD OF REVIEW

¶25. Because the Tennesens' case was brought pursuant to the MTCA, it was heard and determined by the trial judge sitting without a jury. Miss. Code Ann. § 11-46-13(1). "A circuit court judge sitting without a jury is accorded the same deference with regard to his findings as a chancellor, and his findings are safe on appeal where they are supported by substantial, credible, and reasonable evidence." *City of Jackson v. Gray*, 72 So. 3d 491, 495 (¶12) (Miss. 2011) (quoting *Richardson*, 913 So. 2d at 977 (¶13)). "Although reasonable minds might differ on the conclusion of whether or not the officer in question acted in reckless disregard, it is beyond this Court's power to disturb the findings of the trial judge if supported by substantial evidence." *Miss. Dep't of Wildlife, Fisheries, & Parks v. Webb*, 248 So. 3d 772, 777 (¶4) (Miss. 2018) (quoting *Richardson*, 913 So. 2d at 978 (¶15)). "In a bench trial, when the trial judge sits as the finder of fact, he [or she] has the sole authority for determining the credibility of witnesses." *Id.* (quoting *Brister*, 838 So. 2d at 279 (¶19)). The Court "reviews errors of law de novo, including the proper application of the Mississippi Tort Claims Act." *City of Laurel v. Williams*, 21 So. 3d 1170, 1174 (¶15) (Miss. 2009).

## DISCUSSION

### I.   Applicable Law

¶26. Section 11-46-9(1)(c) of the MTCA provides immunity for actions relating to police protection under certain conditions, as follows:

(1) A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim:

. . . .

(c) [a]rising out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activities relating to police or fire protection *unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury*[.]

(Emphasis added).

¶27. The trial court found Officer Knight was acting in the "course and scope of [his] employment" with the City, and the Tennesens were not engaged in "criminal activity" at the time of the collision. Thus, to recover for damages under the MTCA in this case, the Tennesens were required "to prove by a preponderance of evidence that [Officer Knight] acted in reckless disregard of [their] safety" when he pursued Willis. *Williams*, 21 So. 3d at 1174 (¶17). The trial court found that the Tennesens failed to do so. Based upon the standard of review set forth above, the issue before this Court is whether "substantial evidence" supports the trial court's determination that Officer Knight did not act in "reckless disregard" for the Tennesens' safety in this case. *Webb*, 248 So. 3d at 777 (¶4).

¶28. In undergoing this analysis, we bear in mind that the Mississippi Supreme Court has held that "'reckless disregard' under [s]ection 11-46-9(1)(c) embraces willful and wanton conduct which requires knowingly or intentionally doing a thing or wrongful act." *Rayner v. Pennington*, 25 So. 3d 305, 308-09 (¶11) (Miss. 2010). "While the conduct does not have to be intentional, '[r]eckless disregard usually is accompanied by a conscious indifference

13

to consequences, amounting almost to a willingness that harm should follow.'" *City of Clinton v. Tornes*, 252 So. 3d 34, 38 (¶13) (Miss. 2018) (quoting *Rayner*, 25 So. 3d at 309 (¶11)).

¶29. The supreme court has set forth ten factors for a trial court to consider when assessing "reckless disregard" in police-pursuit cases, as follows:

> (1) length of the chase; (2) type of neighborhood; (3) characteristics of the streets; (4) presence of vehicular or pedestrian traffic; (5) weather conditions and visibility; (6) seriousness of the offense for which the police are pursuing the suspect; (7) whether the officer proceeded with sirens and blue lights; (8) whether the officer had available alternatives which would lead to the apprehension of the suspect besides pursuit; (9) existence of a police policy which prohibits pursuit under the circumstances; and (10) rate of speed of the officer in comparison to the posted speed limit.

*Gray*, 72 So. 3d at 496-97 (¶17) (citing *Richardson*, 913 So. 2d at 977 (¶15)); *see also Brister*, 838 So. 2d at 280 (¶22). In undertaking a "reckless disregard" analysis, "[i]t is appropriate for trial courts to consider all ten factors, and to look at the totality of the circumstances when analyzing whether someone acted in reckless disregard." *Gray*, 72 So. 3d at 497 (¶17) (quoting *Richardson*, 913 So. 2d at 978 (¶17)).

## II. The City's Pursuit Policy

¶30. The City has a pursuit policy set forth in Chapter 103 of its Administrative Operations Manual that was admitted into evidence. With respect to an officer's assessment whether to commence a pursuit, the policy delineates a number factors that are similar, but not identical, to the *Brister/Richardson* factors. In this regard, the pursuit policy provides:

> Each officer must use his discretion in determining whether or not to

14

commence a chase bearing in mind the guideline outlined herein. Many factors should have a bearing on this choice, but some of the major ones are listed:

A. Road conditions.

B. Traffic conditions.

C. Weather conditions.

D. Time of day.

E. Type of vehicle involved.

F. Nature of the offense.

G. Condition of the police car.

H. Officer's knowledge of the area.

Additional provisions of the HPD pursuit policy will be discussed in context below.

### III.    The Trial Court's Ruling

¶31.    After setting forth a detailed summary of the trial testimony, as well as the judicial precedent addressing police-pursuit cases and the law's application to the facts before the court, the trial court found as follows:

> In reaching a decision on this issue, the Court considered the testimony of Jacob Knight, Lt. Harris Tapp, Lt. Mark Denny, and expert Mark Dunston, reviewed documentary evidence relating to policy and pursuit, and viewed [O]fficer Knight's body and vehicle camera footage. The testimony of each of these witnesses was credible. Tapp, Denny and Dunston have decades of law enforcement experience. Dunston has served as a training officer for many law enforcement agencies and is certified as an instructor in many law enforcement activities, including pursuits. All three witnesses are familiar with HPD's pursuit policies, [O]fficer Knight's actions on the day of the accident, and expressed opinions relating to the propriety of [O]fficer Knight's

15

actions in initiating and continuing the pursuit. Dunston opined that Knight's actions complied with HPD's pursuit policies and that the cause of the accident was the actions of James Willis. He discussed the *Brister* factors, applied those factors to the actual actions of [O]fficer Knight, and confirmed that all of the factors favored the initial attempt to stop Willis and continue the pursuit once he fled. Finally, Dunston opined that Knight did not act with reckless disregard.

Applying the precedent set by our appellate courts in a line of Mississippi police pursuit cases . . . to the factual circumstances as established by testimonial and documentary evidence, the Court finds that the length of the pursuit was short both in time and distance (approximately 50 seconds and ½ mile); the character of the neighborhood was commercial; the roadway was well[-]paved and wide with divided lanes; vehicular traffic was relatively light; the weather was clear; the officer was familiar with his vehicle which was in good condition; the officer was proceeding with emergency lights and sirens; neither the officer [n]or his supervisors had sufficient time to evaluate whether or not available alternatives would lead to the apprehension of the suspect besides pursuit; the reported shoplifting could have been either a felony or misdemeanor; no departmental policy precluded a pursuit under the factual circumstances; and that [Officer] Knight's speed was not excessive in light of the speed limit. These factors favored the initiation and continuation of the pursuit.

The Court finds that based upon the totality of the circumstances, the actions of [O]fficer Jacob Knight did not rise above simple negligence, that he did not act in reckless disregard of the safety and well-being of the Tennesens who were not engaged in criminal activity, and that the City is entitled to police-protection immunity . . . [and] entitled to judgment pursuant to Mississippi Code Annotated [section] 11-46-9 (l)(c).

IV.    **The *Brister/Richardson* Factors and the HPD Pursuit Policy Factors[6]**

¶32.    We now address each of the *Brister/Richardson* factors and the HPD pursuit policy

---

[6] Where applicable, the factors and other considerations delineated in the HPD pursuit policy will also be referenced.

16

factors.

### A. *Brister/Richardson* Factors and the Overlapping HPD Pursuit Policy Factors

### 1. Length of the Chase

¶33. The trial court found that "the length of the pursuit was short both in time and distance (approximately 50 seconds and ½ mile)." Officer Knight's testimony, the video evidence, and the dispatch record show that the pursuit was short, lasting just twenty-seven seconds from the time Officer Knight determined that Willis was not stopping in response to his blue lights and sirens and called into dispatch that he was initiating a pursuit.

¶34. The Tennesens point out that when Officer Knight completed the "Vehicle Pursuit Form" that was admitted into evidence, he wrote that the pursuit lasted one minute and forty-five seconds. However, at trial, Officer Knight explained that the actual "pursuit," as defined in the HPD pursuit policy, did not begin until he called in the pursuit (dispatch code 1094) just twenty-seven seconds before the collision occurred.

¶35. The HPD pursuit policy defines "pursuit" as

> an active attempt by an on-duty officer in an authorized emergency vehicle to apprehend one or more occupants of a moving vehicle, providing[] a reasonable and prudent driver of such vehicle would be aware of the attempt and is avoiding apprehension by maintaining or increasing speed, taking evasive action[,] or otherwise ignoring the officer's attempt to stop him/her.

¶36. Chief Dunston, the City's expert, also opined that approximately twenty-seven seconds elapsed between the 1094 call and the collision with the Tennesens' vehicle based upon his review of the HPD pursuit policy, including the definition of "pursuit," as well as

17

the evidence and testimony presented at trial. He explained that "if you take [the definition of pursuit in the policy] . . . and matched it to Mr. Willis's actions, it was clear [that] at . . . [the] Mayfair . . . intersection, . . . [the suspect] . . . really accelerated and demonstrated that he was not going to stop. So I would consider that at that point [the pursuit] began." Continuing, Chief Dunston testified that from the "approximate intersection of Mayfield and [Highway] 98 to Westover and [Highway] 98 is about a half mile." Both Lt. Denny (Officer Knight's on-duty supervisor) and Chief Dunston testified that the pursuit was short in both time and duration.

¶37. According to Lt. Tapp, the HPD commander of internal affairs who investigated the pursuit, based upon his review and his findings in the pursuit report that was admitted into evidence, it did not become apparent that the suspect was fleeing until approximately fifty-five seconds after the initial activation of Officer Knight's emergency equipment when Officer Knight radioed, "Hattiesburg, he's not stopping" at the Fairfield Drive intersection. From this point, the pursuit continued for approximately fifty seconds. He concluded that the pursuit was "short" and stated that based upon his review, Officer Knight did not push the suspect to drive faster or in a reckless manner at any point and did not violate HPD policy.

### 2. Type of Neighborhood

¶38. The trial court found that the "character of the neighborhood was commercial" and did not preclude pursuit. Officer Knight, Lt. Tapp, and Chief Dunston testified that the

18

neighborhood was commercial, not residential, as also was shown by the video evidence. Additionally, Lt. Tapp confirmed that a "commercial" area, as opposed to a residential area, would weigh toward pursuit. Likewise, Chief Dunston opined that this factor did not weigh against pursuit.

¶39.    The Tennesens assert that "Sunday afternoon in an area with churches, businesses, restaurants, gas stations, and hundreds, if not thousands, of cars made the high-speed chase extremely dangerous," but they cite to no evidence in the record supporting their overbroad statement as it relates to the particular circumstances during the pursuit.

### 3.    Characteristics of the Streets[7]

¶40.    The trial court found that "the roadway was well paved and wide with divided lanes" and did not preclude pursuit. The video evidence shows that the roads were in good condition; Officer Knight testified that the road was mainly flat, dry, and in good condition; Lt. Tapp testified that the road was in good condition, with no gravel or potholes, and the surface was dry; Lt. Denny, the acting supervisor who evaluated all of the conditions in real-time, determined that the conditions did not warrant discontinuing the pursuit; and Chief Dunston testified that the road was fine, it was "well paved, maintained . . . extremely wide . . . eight, maybe in some spots ten lanes wide [and] [i]in some places divided." He opined that in his "pursuit" analysis, these road conditions "would favor the officer continuing the pursuit."

_____

[7] *See* HPD Pursuit Policy, Chapter 103(A) (road conditions).

#### 4.      Presence of Vehicular or Pedestrian Traffic[8]

¶41.    The trial court found that "vehicular traffic was relatively light." Officer Knight testified the traffic was light to moderate, and there were no pedestrians. Lt. Tapp testified that based upon his review of the video evidence, although Highway 98 can be congested at this particular time, it was "not bad" and had "low to moderate traffic conditions" that day. He further stated that "there was very minimal traffic on the road for that area." Lt. Denny testified that Officer Knight reported over the radio at the time of the pursuit that traffic was not very heavy. Chief Dunston testified that, based on his review of the video and evidence, he considered the traffic to be light.

#### 5.      Weather Conditions and Visibility[9]

¶42.    The trial court found that "the weather was clear." This finding is supported by the testimonies of the witnesses and the documentary evidence, and the finding is not disputed by the Tennesens.

#### 6.      Seriousness of the Offense for Which the Officer is Pursuing the Suspect[10]

¶43.    With respect to this factor, the trial court found that "the reported shoplifting could have been either a felony or misdemeanor." Officer Knight testified that shoplifted item was

---

[8] *See* HPD Pursuit Policy, Chapter 103(B) (traffic conditions).

[9] *See* HPD Pursuit Policy, Chapter 103(C) (weather conditions); HPD Pursuit Policy, Chapter 103(D) (time of day).

[10] *See* HPD Pursuit Policy, Chapter 103(F) (nature of the offense).

20

a "55-inch TV," but he did not know whether stealing it was a felony or misdemeanor. His probable cause for stopping the van was that it had a "busted windshield." Lt. Denny confirmed that Mississippi Code Annotated section 63-7-7 (Rev. 2013) prohibited improper equipment on a vehicle, that a broken or "busted windshield" could be a violation, and that such a violation would justify a traffic stop. He also testified that at the time there was a $1,000 threshold for felony shoplifting,[11] but other than the "55-inch television" description on the dispatch call, there was no indication of the television's value. According to Lt. Tapp, "[a]t the time the officer attempted to stop the vehicle, the nature [of the offense] was somewhat unknown. There was a lot of unknowns there. In his knowledge at that time was he had a possible shoplifting suspect and equipment violation . . . [s]o . . . that's all he had to consider."

¶44. Chief Dunston testified that based upon his review of the evidence and testimony, the reported shoplifting could have been either a felony or misdemeanor. He then stated, "And again, . . . Mr. Willis caused this accident so soon and quickly that . . . [this] is [at] the beginning leg of a pursuit. The factors to determine whether or not to continue the pursuit were just being met, were just being evaluated when [the accident] this happened."

### 7. Officer's Sirens and Blue Lights

¶45. The trial court found that Officer Knight was proceeding with emergency lights and sirens. This finding is amply supported by the record and the Tennesens likewise

---

[11] *See* Miss. Code Ann. § 97-23-93(7).

21

acknowledge that Officer Knight utilized both his blue lights and sirens.

**8.      Officer's Available Alternatives That Would Lead to the Apprehension of the Suspect Besides Pursuit**

¶46.    With respect to this factor, the trial court found that due to the short duration of the pursuit, "neither the officer [n]or his supervisors had sufficient time to evaluate whether or not available alternatives would lead to the apprehension of the suspect besides pursuit." Although Officer Knight testified that he understood that WalMart did have surveillance cameras, he also confirmed that in "real-time" he had no information that WalMart had actual good surveillance on this suspect.  He also testified that he had called in the van's out-of-state tag number, but then pointed out that calling in a tag number would not necessarily lead to "find[ing] out who was in [the van]."  Officer Knight testified that in the short time that elapsed between initiating pursuit and the accident, he did not "believe there was any alternatives that would have readily identified who was driving that vehicle."

¶47.    Lt. Denny, who monitored the pursuit, testified that the pursuit had not lasted long enough to get to the point where tire deflation could be deployed.

¶48.    Based upon his review of the testimony and evidence, Chief Dunston testified that Officer Knight attempted to ascertain some information about the driver by calling in his Louisiana license plate, but dispatch had not responded to him yet with any information prior to the accident, so he could not act on that information.  Chief Dunston also noted that given the short duration of the pursuit, Lt. Denny (Officer Knight's supervisor) did not "have the opportunity to notify other officers to get prepared for any other type of alternative

22

approach."

### 9. Existence of a Police Policy that Prohibits Pursuit under the Circumstances

¶49.    Based upon the testimonies of the witnesses and the documentary evidence, including the HPD pursuit policy, the trial court found that "no departmental policy precluded a pursuit under the factual circumstances." For ease of reference, we begin our discussion of this factor by setting forth the relevant portions of the HPD pursuit policy, as follows:

## CHAPTER 103

## PURSUIT DRIVING

**DISCUSSION**: Pursuit is an active attempt by an on-duty officer in an authorized emergency vehicle to apprehend one or more occupants of a moving vehicle, providing[] a reasonable and prudent driver of such vehicle would be aware of the attempt and is avoiding apprehension by maintaining or increasing speed, taking evasive action[,] or otherwise ignoring the officer's attempt to stop him/her.

Society is highly mobile and this, coupled with the natural desire of a law violator to avoid arrest, may often result in situations that suggest the necessity of pursuit contrary to traffic laws and regulative signals.

Patrol Officers are authorized to make an [sic] reasonable effort to apprehend a fleeing violator. It is not in the best interest of public safety to advocate a policy that would encourage the dangerous driver, or the fleeing criminal to proceed without the eminent possibility of police intervention. On the other hand[,] pursuits should not be carried to such an extent as to endanger the lives of innocent users of our streets and highways or the officer. As a general rule, pursuit is not recommended or favored where the danger to the officer and the general public outweighs the advantage of apprehending a fleeing suspect. Stated simply, pursuit is inappropriate when the pursuit itself endangers life more than the escape of the pursued. Delayed arrest may be the wiser choice when the person is known and he or she poses no immediate threat to the community.

23

Each officer must use his discretion in determining whether or not to commence a chase bearing in mind the guideline outlined herein. Many factors should have a bearing on this choice, but some of the major ones [include road, traffic, and weather conditions; the time of day, type of vehicle involved, the nature of the offense and the condition of the police car.]

. . . .

The decision to pursue is not irrevocable and it is the prudent officer who knows when to discontinue pursuit. It is better to abandon the pursuit when the risk of damage to himself or to the public is high, or when weather or road conditions are poor. The experience and common sense of each officer and his knowledge of the area should also guide him in this decision.

When pursuit is undertaken, each officer is responsible for observing the specific procedures that follow.

### 103.1.1  Initiating the Pursuit

A. If possible, especially in situations involving traffic violations or misdemeanors, the Police Officer should attempt to avoid a pursuit. Tactical placement of the police unit can often create a psychological feeling of being caught decreasing the perceived opportunity for flight averting a possible pursuit.

1. The officer shall activate the emergency lights.

2. If the foregoing fails to effectuate a stop, a siren may be used.

3. The emergency lights and siren shall remain activated after the pursuit is undertaken.

B. A continuing pursuit (over a greater distance and for a longer period of time than reasonable in "A") of a motor vehicle is authorized when the officer has reasonable grounds to believe that the operator of the motor vehicle:

1. Is wanted for a felony involving the use or threatened use of force or violence.

24

2. Has just committed, or is about to commit a felony.

3. Is operating the motor vehicle in such a manner that the public's safety is seriously endangered CLEARLY INDEPENDENT of the pursuit itself.

. . . .

D. The officer who pursues is neither relieved of the duty to drive with "due regard" for the safety of all persons nor protected from the consequences of any reckless disregard for safety.

. . . .

F. The pursuit should be terminated if the offense is a misdemeanor and the identity of the violator is known or can be readily determined.

. . . .

## 103.1.4 Command

A. Primary control responsibility shall rest with the telecommunicator under the direction of the on-duty supervisor.

1. If an officer receives a communication from the telecommunicator or any supervisor that the chase be terminated, he/she shall do so immediately . . . .

2. The pursuing officer shall voluntarily terminate pursuit when he/she determines that the safety of the public, conditions of the roads, weather, traffic, or other factors so necessitates . . . .

¶50. The Tennesens acknowledge that Lt. Tapp, Lt. Denny, and the City's expert, Chief Dunston, all testified about the HPD pursuit policy and that they determined that Officer Knight was not in violation of that policy. Nevertheless, the Tennesens assert that Officer

25

Knight violated the pursuit policy, pointing to language in the "DISCUSSION" portion of the policy that, for example, recognizes that "pursuits should not be carried to such an extent as to endanger the lives of innocent users of our streets and highways or the officer."

¶51. The first part of the "DISCUSSION" section of the policy, however, provides that "Patrol Officers are authorized to make an [sic] reasonable effort to apprehend a fleeing violator. It is not in the best interest of public safety to advocate a policy that would encourage the dangerous driver, or the fleeing criminal to proceed without the eminent possibility of police intervention." Officer Knight, Lt. Tapp, Lt. Denny, and Chief Dunston all address the pursuit policy in detail in their testimonies, specifically addressing the reasons why Officer Knight did not violate HPD pursuit policy under the circumstances in this case.

¶52. In particular, Officer Knight testified about his training and study of the pursuit policy. He further testified that he knew of no absolute prohibition on initiating a pursuit based upon a possible misdemeanor or that any policy that prohibited him from initiating the pursuit under the circumstances in this case.[12] Section 103.1.1(A) of the pursuit policy (regarding

---

[12] While the HPD pursuit policy reminds officers that "[i]f possible, in situations involving traffic violations or misdemeanors, the Police Officer should attempt to avoid a pursuit," *see* Section 103.1.1(A), there is no prohibition against initiating a pursuit based upon a possible misdemeanor if other factors warrant initiation of pursuit. *Cf. Brister*, 838 So. 2d at 280 (¶21) (noting that the Jackson Police Department pursuit policy prohibited all pursuits except "when the officer *knows* that a felony has been committed and the officer has probable cause to believe that the individual who committed the felony and the suspect's escape is more dangerous to the community than the risk posed by the pursuit" (emphasis added)); *Hill v. Hinds County*, 237 So. 3d 838, 842-43 (¶14) (Miss. Ct. App. 2017) (reversing summary judgment for Hinds County on police-protection immunity grounds, finding that the deputies, traveling in an unmarked vehicle, had acted in "reckless

26

initiating a pursuit) provides that "[i]f possible, especially in situations involving traffic violations or misdemeanors, the Police Officer should attempt to avoid a pursuit," and then lists ways to do so. Officer Knight explained that he complied with the initial procedures set forth in that provision (activating his blue lights and using his sirens), but then determined that the suspect did not intend to stop. At that point, he initiated a pursuit under Section 103.1.1(A). Officer Knight then confirmed in his testimony that Section 103.1.1(**B**) of the pursuit policy concerned a "*continuing* pursuit (over a greater distance and for a longer period of time than reasonable in 'A')" (emphasis added), and he believed that his initial pursuit of the suspect had not reached the distance or period of time to be considered a "continuing pursuit."

¶53.     Officer Knight also confirmed his understanding that the pursuit policy gave him the "discretion" to initiate a pursuit based upon certain factors, and that he assessed these factors and complied with the pursuit policy when he decided to initiate a traffic stop and pursue the van when it failed to stop under the developing circumstances. He testified that he felt that he "wouldn't have been doing his job" if he had terminated the pursuit after the suspect ran the red light at Mayfair Road. Officer Knight further confirmed that at no time did he believe that the risk to the public was greater than attempting to pull over the suspect.

---

disregard" where, among other factors, the department pursuit policy required "a felony or suspicion of a felony to initiate a pursuit" that admittedly was not present in the case, and further required certain protocols when an unmarked vehicle was used that had not been followed).

¶54.   Lt. Tapp, who conducted the internal affairs review, testified that he did not find any policy violations when he reviewed Officer Knight's actions and compared them with HPD policies.  Likewise, in his internal-investigative-pursuit report, he found that upon a review of all the circumstances, "the pursuit policy of the City of Hattiesburg was not violated."  Lt. Tapp testified about particular provisions of the pursuit policy, including Section 103.1.1(A) and (B) relating to initiating and continuing a pursuit.  He explained that based upon his own review, he determined that Officer Knight had not reached the point of assessing part (B) of that section (whether to continue the pursuit) because Officer Knight "was still in the evaluation process of all the factors that were surrounding all the circumstances involved. He never reached Section B so to speak."  Lt. Tapp was asked, "[The situation] had not reached the greater distance and for a longer period of time than reasonable?"  He responded, "No."

¶55.   Lt. Tapp also addressed Section 103.1.1(F) of the pursuit policy, which provides that "pursuit should be terminated if the offense is a misdemeanor and the identity of the violator is known or can be readily determined."  Lt. Tapp explained that Officer Knight had not violated this section:  "Officer Knight did not know if the offense was a misdemeanor or a felony at the time when he attempted to pull [the suspect] over."  Regarding the suspect's identification, Lt. Tapp testified that "the only identity that could be obtained [from the out-of-state tag number] is not the driver of the vehicle, but the owner. The violator who is driving the vehicle could not be obtained from simply running the tag at that time."

28

¶56. Lt. Denny testified that as he was reviewing the information in real-time, it was his opinion as shift supervisor that Officer Knight complied with the pursuit policy and that his actions were reasonable and proper under the circumstances. As noted above, Lt. Denny had authority to terminate the pursuit, but he did not do so because he did not think termination was warranted under the circumstances.

¶57. Chief Dunston addressed each of the factors an officer should assess in initiating pursuit under the HPD pursuit policy, and opined that after a review of these factors, the *Brister/Richardson* factors, and the entirety of the HPD pursuit policy, Officer Knight complied with the HPD policies. His opinions on these factors are addressed in context with the discussion of each factor.

### 10. Rate of Speed of the Officer in Comparison to the Posted Speed Limit

¶58. The trial court found "that [Officer] Knight's speed was not excessive in light of the speed limit." Officer Knight's body-camera footage shows he called into dispatch at approximately 13:12:59, "We're coming up on Mayfair. He ain't stopping. We're not speeding though." At that time he did not know whether the suspect was trying to evade him. He testified that the van then "picked up speed" that he believed "exceed[ed] 60 mph" and that he (Officer Knight) briefly reached a speed of approximately sixty miles per hour in a forty-five-miles-per-hour zone between Mayfair (when he called in the pursuit) and the scene of the collision on Westover Drive. Officer Knight also testified that although he went through red or yellow lights, he slowed and checked his surroundings at each intersection

29

before proceeding.

¶59. Lt. Tapp testified that based upon his review, he found that the suspect was driving faster than Officer Knight and that "[O]fficer Knight was trying to drive with due regard to public safety" during the pursuit. In his pursuit report, Lt. Tapp stated that in his review he found that "Officer Knight does not push the suspect to drive faster or in a reckless manner at any point," and he concluded that Officer Knight's actions did not violate the HPD pursuit policy.

¶60. Lt. Denny explained that in a pursuit situation, speeds may exceed the speed limit, but he confirmed that his overall conclusion, as patrol supervisor, was that Officer Knight's actions were reasonable and proper under the circumstances.

¶61. Chief Dunston testified that based on his review of the video evidence, Officer Knight "demonstrated professionalism by staying back on [the suspect's] vehicle." He further noted that with respect to going through red lights, an officer is "allowed to go through an intersection when facing a red light when we have blue lights and sirens going as long as we do it in the safest manner possible. And that's exactly what [O]fficer Knight did." Chief Dunston confirmed that in his opinion, Officer Knight "did an excellent job" and acted with due regard for the public's safety and well-being.

### B. Additional Factors in the HPD Pursuit Policy Not Specifically Covered by the *Brister/Richardson* Factors

¶62. Additional factors for the officer's consideration in determining whether to initiate a pursuit under the HPD pursuit policy include the type of vehicle involved; the condition of

the police car; and the officer's knowledge of the area. *See* HPD Pursuit Policy, Chapter 103(E), (G), and (H). The record reflects that the suspect was traveling in a van that Lt. Tapp testified would be considered a large, slow-moving vehicle, not a sports car or a vehicle of that nature that an officer would be unable to catch. Officer Knight testified that the patrol car he was driving was in good condition; Lt. Tapp and Chief Dunston agreed with this assessment. Chief Dunston also observed that Officer Knight appeared to be familiar with the vehicle. Officer Knight also testified that he was familiar with the area.

### C. The Totality of the Circumstances

¶63. Upon our review of the record, we find that "substantial, credible, and reasonable evidence" supports the trial court's findings of fact with respect to each of the *Brister/Richardson* factors and the trial court's determination that, based upon the totality of the circumstances, Officer Knight did not act with reckless disregard in this case.

¶64. In particular, based upon the plain language of the HPD policy definition of "pursuit" as "an active attempt by an on-duty officer [to stop a suspect who is] avoiding apprehension by maintaining or increasing speed, taking evasive action[,] or otherwise ignoring the officer's attempt to stop him," the pursuit here lasted no more than fifty seconds and, according to Officer Knight's own testimony and Chief Dunston's expert opinion, just twenty-seven seconds, involving no more than one-half of a mile. The weather was clear and the roadway was mainly flat, wide, and in good condition.

¶65. Although the pursuit took place on Hardy Street, a main thoroughfare in Hattiesburg,

31

on that Sunday afternoon, the traffic was relatively light, no pedestrians were present, and the pursuit took place in a commercial, not residential area, with most businesses and restaurants set back from the road. Officer Knight's patrol car was in good working condition, and, according to Lt. Tapp, the Econoline van Officer Knight was pursuing was not the type of vehicle, such as a sports car, that would constitute a reason to refrain from or terminate pursuit.

¶66.    While Officer Knight may have briefly reached a speed of approximately sixty miles per hour in a forty-five-mile-per-hour zone, his supervisor Lt. Denny, who was observing the pursuit in real-time, confirmed that Officer Knight's actions were reasonable and proper under the circumstances and he found no basis for calling off the pursuit. Officer Knight had his siren and blue lights activated, he exercised caution in going through intersections, and, as noted in Lt. Tapp's own internal investigation of the incident, "Officer Knight [did] not push the suspect to drive faster or in a reckless manner at any point" during the pursuit. Likewise, Chief Dunston, the City's expert, opined that Officer Knight "did an excellent job" throughout the pursuit in proceeding in the safest manner possible.

¶67.    We acknowledge that the offenses at issue in this case were a reported shoplifting of a television and a "busted windshield," and Officer Knight did not know whether the shoplifting was a misdemeanor or a felony. But the HPD policy does not prohibit pursuits based upon a misdemeanor, and the circumstances in this case were such that due to the short duration of the pursuit before the collision, Officer Knight had only just begun to evaluate

32

the factors whether to continue the pursuit at all. For the same reason, Officer Knight had little time, if any, to evaluate any alternative means to identify the suspect; and Lt. Denny did not have time to notify other officers to get prepared for any other type of alternative approach—factors Chief Dunston took into account in determining that Officer Knight acted reasonably under the circumstances. As detailed above, Lt. Denny and Lt. Tapp found no violation of the HPD pursuit policy under these circumstances, and Chief Dunston similarly found that in his expert opinion, Officer Knight complied with the HPD policies. The Tennesens presented no expert testimony rebutting this conclusion.[13]

---

[13] The dissent cites *Brister* as support for its opinion that Officer Knight acted with "reckless disregard" in this case. But in *Brister*, the supreme court affirmed the trial court's determination that the officers acted in reckless disregard. *Brister*, 838 So. 2d at 281 (¶24). Here, the Tennesens appeal the trial court's determination that Officer Knight did *not* act with reckless disregard. As the supreme court recognized in *Brister*, we are bound to treat the trial judge's findings with "the same deference . . . as [those of] a chancellor, and his findings are safe on appeal where they are supported by substantial, credible, and reasonable evidence." *Id.* at 277-78 (¶13). Thus, given our deferential standard of review, even if *Brister* were squarely on point, that does not necessarily support a reversal of the trial court's judgment here.

In any event, *Brister* is distinguishable. The pursuit in *Brister* took place in a residential neighborhood; the officers failed to block the perpetrator's car at the bank or get her license plate number at the outset, thus requiring the "hot pursuit chase" in the first place, *id.* at 280 (¶21); and, as the dissent acknowledges and as we have addressed above, the Jackson Police Department pursuit policy at issue in *Brister* strictly prohibited all pursuits except where the officer "knows that a felony has been committed." *Id.* These factors are not present here.

Additionally, the *Brister* plaintiffs had their own expert who opined that the officers acted in reckless disregard based on five factors that were cited by the supreme court in determining that "[t]he circuit judge clearly based his findings on substantial, credible, and reasonable evidence." *Id.* at 279 (¶20). The Tennesens had no expert witness testify at trial, while the City, in comparison, not only presented the expert testimony of Chief Dunston but also presented the testimonies of Lt. Denny and Lt. Tapp, as we have detailed above. In

¶68. For all these reasons, we find no error in the trial court's determination that Officer Knight did not act with reckless disregard under section 11-46-9(l)(c). In other words, we find that Officer Knight did not act with "'a conscious indifference to consequences, amounting almost to a willingness that harm should follow,'" *Tornes*, 252 So. 3d at 38 (¶13) (quoting *Raynor*, 25 So. 3d at 309 (¶11)), in this case. *See Gray*, 72 So. 3d at 500 (¶¶33-34) (finding that the record lacked substantial evidence that Jackson police officers acted in reckless disregard during pursuit despite an officer's testimony that he did not know if suspect's offenses were misdemeanors or felonies and evidence that officers became aware that a helicopter was also involved in the pursuit; the court observed that nevertheless, the six-mile pursuit through Jackson took place on streets that were not hilly or curvy, there was little or no traffic in the downtown area, the weather was clear and sunny, lights and sirens were engaged during the pursuit, and the officers did not travel at high rates of speed); *cf. City of Jackson v. Lewis*, 153 So. 3d 689, 700 (¶29) (Miss. 2014) (finding *continued* pursuit displayed reckless disregard based upon officer's "wanton defiance of the order of his superior to terminate pursuit" when the suspect accelerated, and the officer's "failure to comply with the standard articulated by this Court for communicating termination to the pursued party [by either stopping or turning around]"); *City of Jackson v. Law*, 65 So. 3d 821,

sum, as we have found above, Chief Dunston's expert testimony, the testimonies of Lt. Denny and Lt. Tapp, together with Officer Knight's testimony and the other evidence, support the trial court's factual findings and ruling that Officer Knight did not act in reckless disregard. We find no basis for reversal in this case.

34

832 (¶44) (Miss. 2011) (finding continued pursuit was in reckless disregard where the pursuit was for seven miles lasting between five and six minutes, the officer and suspect traveled through residential neighborhoods and the plaintiff's police-pursuit expert opined that the officer violated departmental pursuit policy by failing to re-evaluate the pursuit as it progressed and by continuing the pursuit after being ordered to terminate if the subject began running red lights after the suspect did so). Accordingly, the trial court's judgment is affirmed.

¶69. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., GREENLEE, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. McDONALD, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD, J.**

**WESTBROOKS, J., DISSENTING:**

¶70. The trial court erred by finding that Officer Knight did not act in reckless disregard of the public's safety in the continued pursuit of a suspected misdemeanor shoplifter on Highway 98. Therefore, I respectfully dissent from the majority's decision to affirm the trial court's judgment.

### *Relevant Facts*

¶71. On Sunday, September 17, 2017, at 1:00 p.m., Officer Jacob Knight received a dispatch call about an attempted shoplifting of a fifty-five-inch television at Walmart on Highway 98, an area containing "numerous businesses, restaurants, and churches." Officer Knight's incident report reveals that he knew the suspect would be driving a "white [F]ord

35

van with a Louisiana license plate." Officer Knight arrived on scene at approximately 1:08 p.m. He began "traveling through the Walmart [p]arking lot. . . ." When Officer Knight drove out of the parking lot and onto Highway 98, he saw a white 1993 Ford Econoline van in front of Lowe's at the intersection of Weathersby Drive with a "busted windshield."[14] In his statement, Officer Knight wrote that he "attempted to pull the vehicle over for [i]mproper [e]quipment. Officer Knight then pulled behind the vehicle and turned on his blue lights and sirens. I opine the pursuit began at this time.

¶72. With the Louisiana license tag of the vehicle then visible, Officer Knight called in tag number 796AFG/LA to dispatch at 1:12:24 p.m., with Officer Knight in pursuit. The suspect ran through the intersection of Mayfair Road and Highway 98 at 1:12:56. At 1:13:15 p.m., Officer Knight reported a "1094" to dispatch (the code for pursuit in progress). Twenty-seven seconds later, Officer Knight reported a "1050'D" (a vehicular accident) at the intersection of Westover Drive and Highway 98.

¶73. It is undisputed that when Officer Knight turned on his blue lights and sirens, the driver of the vehicle, James Willis, continued straight through the Weathersby intersection. Willis then proceeded to run the red light at the Fairfield intersection too. By the time Willis reached the next intersection, he was driving in the right turning lane, had picked up speed,

_____

[14] Beyond Officer Knight's testimony, there is nothing in the record that supports his statement. The vehicular camera footage (without audio) from Officer Knight's vantage point does not show a cracked windshield, and the City of Hattiesburg did not provide photographs of a cracked or busted windshield prior to the collision.

and ran the red light at the Mayfair intersection. While driving through Mayfair Road and Coca-Cola Avenue, Officer Knight called in the 1094 (at 1:13:15 p.m.). Willis ran the Coca-Cola Avenue red light as well. Upon entering the Westover intersection, Willis crashed into John and Sandra Tennesen, who were making a left turn in a gray 2017 Nissan.

¶74. Willis attempted to flee the crash on foot after hitting the Tennesens, but Officer Knight chased after and arrested him on site. Numerous Hattiesburg police officers were then called and arrived on scene. It was only during the initial investigation of the accident and after the prompting of another officer that Officer Knight finally called Chip Box, Walmart's loss-prevention asset officer, from his personal cell phone.

¶75. Officer Knight said to Box, "Hey [Box] . . . did he get some batteries from y'all? . . . He got about seven or eight batteries behind the van." Minutes later, Officer Knight stated to another police officer, "[Box] said they been watching him all day. He been in and out of Walmart . . . [Box] usually call me and be like . . . been coming in an out all day. . . ."

¶76. The Hattiesburg Police Department (HPD) determined that the Vizio television never left Walmart's premises and that it had a value of $498. They subsequently charged Willis with misdemeanor shoplifting pursuant to Mississippi Code Annotated section 97-23-93(14) (Rev. 2014). The Tennesens sued the City of Hattiesburg under the Mississippi Tort Claims Act (MTCA). The Tennesens argued that Officer Knight acted in reckless disregard of their and the public's safety, and therefore the City was not immune from liability for its actions. At the time of the accident, Officer Knight was a patrolman for HPD and had been with the

37

department for less than a year.

¶77.    During trial, Officer Knight testified that he regularly worked shoplifting calls for

Walmart:

> Q.    So you were aware before we get to the Tennesens then, that a crash resulting from a chase was foreseeable then, right?
> A.    Yes.
> Q.    Now, I think in the video I noticed that you actually made a phone call to Chip Box. Would you tell the Court who Chip Box is?
> A.    Chip Box is the loss prevention asset at Walmart.
> Q.    You actually had his phone number on your own cellphone, right?
> A.    Yes, sir.
> Q.    How often did you work calls at Walmart there on 98?
> A.    I would say at least once a week, probably more.

He also stated that he was very familiar with Highway 98 because he grew up in Petal,

Mississippi. Officer Knight admitted that he had experienced previous police pursuits that

resulted in vehicular accidents, one of which occurred on Highway 98. He agreed that

"running red lights, speeding, and riding in the turn lane were dangerous activities and

sometimes caused crashes." He further testified that he knew there were surveillance

monitors at Walmart, but he did not know the value of the fifty-five-inch television that was

allegedly stolen. Although he knew that the Westover intersection was one of "the most

dangerous, busiest intersections in the city," he wanted to pull Willis over for a busted

windshield[15] and a suspected shoplifting, and he felt that he would not be doing his job if he

---

[15] The City of Hattiesburg points to Mississippi Code Annotated section 63-7-7 (Rev. 2013) as evidence that a motor vehicle operator is prohibited from having a "busted windshield." Section 63-7-7 provides:

terminated the pursuit.

¶78.  At the close of the Tennesen's case-in-chief, the City moved for a Rule 41(b) dismissal. M.R.C.P. 41(b) (involuntary dismissal).  After an exhaustive argument that highlighted the absence of the plaintiff's expert testimony, the trial court denied the motion. In its opinion and final judgment, the trial court concluded that Officer Knight did not act in reckless disregard of the public's safety on the grounds that

> the length of the pursuit was short both in time and distance (approximately.50 seconds and 1/2 mile); the character of the neighborhood was commercial; the roadway was well paved and wide with divided lanes; vehicular traffic was relatively light; the weather was clear; the officer was familiar with his vehicle which was in good condition; the officer was proceeding with emergency lights and sirens; neither the officer or his supervisors had sufficient time to evaluate whether or not available alternatives would lead to the apprehension of the suspect besides pursuit; that the reported shoplifting could have been either a felony or misdemeanor; no departmental policy precluded a pursuit under the factual circumstances; and that Knight's speed was not excessive in light of the speed limit. These factors favored the initiation and continuation of the pursuit.

### *Discussion*

**The totality of the circumstances supports a finding of reckless disregard.**

---

> It is a *misdemeanor* for any person to drive or move or for the owner to cause or knowingly permit to be driven or moved on any highway any vehicle or combination of vehicles which is in such unsafe condition as to endanger any person, or which does not contain those parts or is not at all times equipped with such lamps and other equipment in proper condition and adjustment as required in this chapter, or which is equipped in any manner in violation of this chapter, or for any person to do any act forbidden or fail to perform any act required under this chapter.

(Emphasis added).

¶79.    Keeping our standard of review in mind that "it is beyond this Court's power to disturb the findings of the trial judge if supported by substantial evidence," I find that the trial court's judgment in this case was not supported by the totality of the circumstances. *Floyd v. Tunica County*, 333 So. 3d 864, 873 (¶34) (Miss. Ct. App. 2022).  Contrary to the trial court's judgment, the overwhelming evidence[16] supports a finding that being familiar with Highway 98 and having experienced three previous vehicular collisions (one on Highway 98), Officer Knight acted recklessly by engaging in a police pursuit on a busy Sunday afternoon in a (1) relatively heavy trafficked commercial area; (2) for a nonviolent shoplifting offense; and (3) in violation of HPD's policy, when he could have terminated the pursuit after obtaining Willis' license plate or investigated the seriousness of the offense.

¶80.    Under the MTCA, government entities are not liable for claims arising from their employee's actions that are within the scope of their duties, unless a police officer, acts "in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury." Miss. Code Ann. § 11-46-9(1)(c) (Rev. 2019).  "[R]eckless disregard 'is a failure or refusal to exercise any care, while negligence is a failure to exercise due care.'" *Sanders v. Attala County*, 332 So. 3d 292, 300 (¶33) (Miss. Ct. App. 2021) (quoting *Maye v. Pearl River County*, 758 So. 2d 391, 395 (¶21) (Miss. 1999)).

---

[16] Despite the majority's acknowledgment that the "Tennesens had no expert witness testify at trial," *ante* at n.13, the trial court dismissed the City's Rule 41(b) motion at the close the Tennesens' case-in-chief.  Because the lack of an expert witness was not fatal to the Tennesens' case at trial, the absence of such evidence should not be considered as a saving grace for affirmance on appeal.

¶81. Whether a police officer acts in reckless disregard of the safety of the public when engaging in a police pursuit is an inquiry guided by the *Brister/Richardson* factors:

> (1) The length of the chase[;] (2) Type of neighborhood; (3) Characteristics of the streets; (4) The presence of vehicular or pedestrian traffic; (5) Weather conditions and visibility; (6) The seriousness of the offense for which the police are pursuing the suspect; (7) Whether the officer proceeded with sirens and blue lights; (8) Whether the officer had available alternatives which would led to the apprehension of the suspect besides pursuit; (9) The existence of police policy which prohibits pursuit under the circumstances; and (10) The rate of speed of the officer in comparison to the posted speed limit.

*City of Ellisville v. Richardson*, 913 So. 2d 973, 977 (¶15) (Miss. 2005) (parentheses added) (quoting *Johnson v. City of Cleveland*, 846 So. 2d 1031, 1037 (¶19) (Miss. 2003)) (McRae, P.J., concurring)); *accord City of Jackson v. Brister*, 838 So. 2d 274, 280 (¶22) (Miss. 2003). However, our courts are not confined to the *Brister/Richardson* test when making their determination. *See, e.g.*, *City of Jackson v. Gray*, 72 So. 3d 491, 500 (¶32) (Miss. 2011) ("Although these are not factors traditionally included in a reckless-disregard analysis, the unique facts of this case warrant consideration of the foregoing facts."). "We must judge the nature of the officer's actions on an objective standard with all the factors that they were confronted with, taking into account the fact that the officers must make split-second decisions." *Giles ex rel. Giles v. Brown*, 31 So. 3d 1232, 1238 (¶13) (Miss. Ct. App. 2009) (citing *Phillips v. Miss. Dep't of Publ. Safety*, 978 So. 2d 656, 661 (¶19) (Miss. 2008)). We, therefore, should evaluate the police officer's conduct under a totality-of-the-circumstances standard when determining whether an officer acted recklessly. *Id*. at 1237-38 (¶13); *Richardson*, 913 So. 2d at 978-79.

41

¶82.    In *Brister*, the City of Jackson argued that the officer did not act in reckless disregard

when chasing a suspected check forger on Old Canton Road. *Brister*, 838 So. 2d at 276 (¶7).

Applying the factors above to the facts of *Brister*, the trial court determined that the officers

acted in reckless disregard when

> 1) the chase was contrary to General Order 600–20; 2) the officers were still
> engaged in active pursuit up to the collision; 3) pursuit should have been
> terminated after the officers turned onto Ridgewood Road and realized the
> suspect would not stop; 4) the officers did not attempt to obtain the license
> plate number which would have eliminated the need for continued pursuit; and
> 5) the officers did not properly balance the public's safety versus immediate
> apprehension of a check forger.

*Id*. at 279 (¶20).   Our supreme court affirmed the trial court's determination and held that

"overwhelming evidence exists that the officers acted in reckless disregard to the general

safety of the public." *Id*. at 281 (¶23).   The *Brister* court stated that if in *Maye*, the court

found that an officer's backing into an oncoming vehicle was reckless, so too could the court

find that the police officer's conduct at issue was reckless. *Id*. at 280-81 (¶23) (citing *Maye*,

758 So. 2d at 395).

> ## A.    The Knowledge and Experience of Officer Knight

¶83.    Again, this Court is not confined to the *Brister/Richardson* factors and may consider

all relevant circumstances under the totality of the circumstances standard. *Gray*, 72 So. 3d

at 500 (¶32).   In this instance, and as found by the trial court, Officer Knight stated that

> during his employment he routinely wrote traffic citations for speeding and
> running red lights because those actions are dangerous and citations were
> issued to prevent those actions; that he had been involved in approximately
> three previous pursuits prior to the accident involving the Plaintiffs; that one

42

of the pursuits ended in a vehicular crash between victims and the operator of the vehicle being pursued; that based upon his pursuit experience he was aware that pursuit related accidents were foreseeable; and that he frequently worked calls for service at Wal-Mart on 98 and was familiar with its procedures and surveillance capabilities.

. . . .

[He] knew that the Westover intersection was one of the most dangerous intersections in the city and that he was not thinking about a possible accident or the Tennesens' as he continued the pursuit.

In this very detailed order, the trial court neglected to also include the fact that Officer Knight testified to having experienced a previous vehicular collision *on Highway 98*. During trial Officer Knight was asked, "But one of your prior chases that you were involved in before the Tennesen's, there was a crash on Highway 98, right?" Officer Knight responded, "Yes, sir." In no uncertain terms, Officer Knight testified that even though he knew the risks involved with police pursuits on Highway 98 and knew that a vehicular collision was foreseeable, he chose to continue the pursuit of the suspect of a nonviolent misdemeanor offense.

###    B.    The Length of the Chase

¶84.    I conclude the trial court erred by finding that the length of the chase was too short for Officer Knight to have considered the public's safety or alternatives. Relying on *Brister*,[17] I find that Officer Knight did have sufficient time to weigh public safety interests.

---

[17] I cite *Brister* solely for the position of the timing as it relates to the "length of the chase" factor in comparison to the case at bar.

43

In *Brister*, the City argued that the officers were not reckless because "the chase lasted less than 60 seconds over a distance of less than a mile." *Id*. at 279 (¶17). Not persuaded, our supreme court held even when the pursuit was less than 60 seconds, the officers were reckless. *Id*. at 281 (¶23).

¶85. The chase in this instance lasted approximately the same or longer than the chase in *Brister*. *See id*. at 279 (¶17). Beginning from the moment Officer Knight turned his lights and sirens on, the chase lasted approximately one minute and twenty-seven seconds. However, the trial court found that the chase lasted approximately fifty seconds. Whether the pursuit lasted 1 minute and 27 seconds or 50 seconds, I find under *Brister* that the length of the chase was sufficient for Officer Knight to have considered the public's safety.

### C. The Presence of Vehicular or Pedestrian Traffic in a Commercial Area

¶86. The Tennesens brought this appeal and presented this case as one of first impression to consider police pursuits taking place "in an area with higher retail." Previously, the supreme court and this Court have held that officers acted in reckless disregard under circumstances where the area is a mix of residential and commercial or solely residential. *See Ellisville*, 913 So. 2d at 979 (¶¶19, 21); *City of Jackson v. Thornton*, 94 So. 3d 1186, 1192-93 (¶¶23, 33) (Miss. Ct. App. 2011); *see also District of Columbia v. Hawkins*, 782 A.2d 293 (D.C. 2001). Comparatively, the supreme court held in *Gray*, that the officers did not act in reckless disregard by engaging in a police pursuit in downtown Jackson, a commercial area. *Gray*, 72 So. 3d at 500 (¶34).

44

¶87.    However, I emphasize, now, that the purpose behind the *Brister* factors is to determine whether the conduct of the police officer disregarded the safety of the public. While there have been instances where our appellate court has found that an officer did not act in reckless disregard when pursuing a suspect in a commercial area, it is not the categorization of whether an area is residential or commercial in a silo that determines whether an officer acted recklessly. It is the condition of the area. Even when considering *Gray*, a portion of our Supreme Court's holding rested on the fact that "there was little to no traffic in the downtown Jackson area"—not that the area was commercial. *Gray*, 72 So. 3d at 498 (¶23). Likewise, when reviewing *Hawkins* (the decision upon which the *Brister* factors are relied upon) the District Court of Columbia emphasized that the actions of the officers were reckless because "[a]ll of the officers involved in the chase were familiar with the conditions of the neighborhood. The chase and ensuing accident happened during the rush hour, at a busy intersection for vehicular and pedestrian traffic." *Hawkins*, 782 A.2d at 301. Therefore, in my view, whether an area is commercial or residential, the relevant inquiry is the danger involved based upon the condition of the area at the time of the incident. This includes the time of the chase and the presence of traffic.

¶88.    With this in mind, I now differentiate the facts of *Gray* from the facts of this case. In *Gray*, the evidence showed that the pursuit began on a Saturday afternoon at approximately 5:42 p.m. *Id.* at 498 (¶23). Testimony showed that the traffic either was light or that there was little to no traffic in the downtown Jackson area at the time of the pursuit. *Id.*

45

¶89.   Here, the trial court characterized the traffic as "*relatively* light." (Emphasis added). However, the trial court did not provide another time period or area to compare the traffic to.  And with all due respect, the video in the record depicts a different account of the nature of the traffic at the time of the incident.  According to the video, the traffic was relatively heavy for a Sunday afternoon.  Regardless of it being a commercial area, the heavy traffic combined with Officer Knight's admittance that the Westover intersection was one of the most dangerous intersections in the city, and that Officer Knight engaged in this pursuit at 1:00 p.m. on a Sunday afternoon, distinguishes this case from *Gray*.

### D.   The Seriousness of the Offense

¶90.   The trial court found that Officer Knight admitted that   the "white van was not breaking any traffic laws, had a cracked windshield, that he was not aware of the shoplifting level [felony or misdemeanor], and that he did not know whether the violator was in the van."  Therefore, at the time of the pursuit Officer Knight pursued Willis on the basis of a misdemeanor offense, having no other reason to believe that Willis committed a felony.

### E.   The Other Available Alternatives

¶91.   Officer Knight testified that he knew that a crash was foreseeable because he previously had engaged in a police pursuit that led to a vehicular collision on Highway 98. Additionally, when Officer Knight called in the license plate number to dispatch at the very beginning of the pursuit, he could have requested assistance from other units at this point. Officer Knight also possessed the phone number of Chip Box, the 911 caller, in his (Officer

46

Knight's) personal cell phone. He had ample time to contact Box. Had he called Box before the pursuit and learned that the shoplifting was a misdemeanor, he could have chosen to terminate the pursuit.

### F.    The Violation of Police Pursuit Policy

¶92.    HPD's pursuit policy discourages pursuits, and in my opinion Officer Knight failed to abide by the policy,[18] which states in relevant part:

103.1.1 Initiating the Pursuit
A.    *If possible, especially in situations involving traffic violations or misdemeanors, the Police Officer should attempt to avoid a pursuit.* Tactical placement of the police unit can often create a psychological feeling of being caught decreasing the perceived opportunity for flight averting a possible pursuit. . . .

B.    A continuing pursuit (over a greater distance and for a longer period of time reasonable in "A") of a motor vehicle is authorized when the officer has reasonable grounds to believe that the operator of the motor vehicle: . . .

3.    *Is operating the motor vehicle in such a manner that the public's safety is seriously endangered CLEARLY INDEPENDENT of the pursuit itself.*

(Italics added).

---

[18] I acknowledge that the police-pursuit policy here is distinguishable from the police-pursuit policies provided in previous cases. Nevertheless, this Court does not base its legal determination of whether an officer acted recklessly solely on the policies of police precincts that may for any reason change or adapt in the future. *See Miss. Dep't of Wildlife, Fisheries, & Parks v. Webb*, 248 So. 3d 772, 779 (Miss. 2018) (discussing that the violation of police policy, does not, by itself, establish reckless disregard). Despite the fact that our holdings consider the police pursuit policies under the totality-of-the-circumstances standard, we have never held that any factor or circumstance is controlling or gives more weight than the other. The fact that the police policy here contains language that is less demanding than that of other police policies does not outweigh the other factors discussed.

47

¶93. While HPD's pursuit policy states that continued pursuit is authorized when the officer has reason to believe that the individual is operating a vehicle that endangers the public's safety CLEARLY INDEPENDENT of the pursuit itself, Officer Knight testified that he chose to pursue the vehicle for having a busted windshield, which is a traffic violation or misdemeanor offense. Expert testimony was not necessary to make this finding. A logical interpretation of the HPD's pursuit policy dictates, then, that Officer Knight should have "attempt[ed] to avoid a pursuit." He did not. Meanwhile, the public's safety was not "seriously endangered" by an individual driving a vehicle with a busted windshield, and Lieutenant Tapp's acknowledgment that Willis was not driving erratically prior to the pursuit corroborates this fact. Consequently, it was instead Officer Knight's initiation of the pursuit of Willis for a nonviolent crime that "seriously endangered" the public.

¶94. Based on the totality of these circumstances, I would find that Officer Knight acted in reckless disregard of the public's safety. I respectfully dissent.

**McDONALD, J., JOINS THIS OPINION.**